**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KING PHARMACEUTICALS, INC. | ) | |
| and MERIDIAN MEDICAL | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 11-065 (BMS) |
| v. | ) | |
| | ) | |
| INTELLIJECT, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTELLIJECT'S ANSWER,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant Intelliject, Inc. ("Intelliject") was founded by patients Eric and Evan Edwards for the purpose of creating a new device for delivering epinephrine to individuals experiencing severe allergic reactions.  When approved by the U.S. Food and Drug Administration ("FDA"), Intelliject's innovative device will provide patients with a superior product that solves the problems not currently addressed by commercially available epinephrine auto-injectors, such as the EpiPen® Auto-Injector, the product marketed by Plaintiffs.

In short, Intelliject has invented an "epi-Card" device that, when compared to Plaintiffs' EpiPen® product, has a smaller and highly portable shape that is the height and width of a credit card with the thickness of a cell phone.  In addition, Intelliject's epi-Card device has a number of unique features, including compressed gas actuation, a retractable needle to eliminate unintentional injections, a non-coaxial design allowing for the thin card form factor, and the Intelliject Prompt System (iPS), an electronic system that provides audible instructions for use and visual cues to guide a patient or care provider through successful injection of epinephrine. As a result of Intelliject's research and development efforts, it has been awarded seven U.S.

1

patents and has twelve pending U.S. patent applications for its medical injectors and methods of medicament delivery.

Beginning in 2010, Intelliject began planning to seek formal approval for its device from the FDA.  Because Plaintiff Meridian Medical Technologies, Inc. ("Meridian") had listed its U.S. Patent No. 7,449,012 ("the '012 patent") in the FDA Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book"), on June 22, 2010, Intelliject informed Meridian, c/o King Pharmaceuticals, Inc. ("King"), of its intent to seek FDA approval and set forth the reasons why its device did not infringe the '012 patent.  On August 20, 2010, Intelliject again contacted Meridian, c/o King, seeking a response to its June 22, 2010 letter.  There was no response to either letter.  After becoming aware of the September 14, 2010 issuance of U.S. Patent No. 7,794,432 ("'432 patent") to Meridian, Intelliject sent another letter on September 30, 2010 to Meridian, c/o King, seeking a response to its previous letters and setting forth the reasons why its device did not infringe the '432 patent.  Again, there was no response.

On September 29, 2010, Intelliject submitted a New Drug Application ("NDA"), assigned No. 201739, with the FDA seeking approval for its device.  On December 8, 2010, the President and CEO of Intelliject sent a letter to the legal department of Meridian, c/o King, regarding "Notice of NDA No. 201739 Concerning Epinephrine Auto-Injector Product With Paragraph IV Certification Concerning U.S. Patent Nos. 7,449,012 and 7,794,432."  With this Paragraph IV Certification letter, Intelliject notified Meridian that the FDA had accepted for filing the NDA submitted by Intelliject seeking approval to engage in the commercial manufacture, use, and sale of Intelliject's proposed device prior to the expiration of the '012 and the '432 patents.  Exhibits attached to that letter provided a detailed statement of the factual and legal bases establishing

that the '012 and the '432 patents would not be infringed by the manufacture, use, or sale of Intelliject's proposed device and that the patents were invalid.

On January 4, 2011, King & Spalding, counsel for King and Meridian, requested samples of Intelliject's epi-Card devices, which Intelliject provided the next business day.  Plaintiffs' counsel was also given access to information on Intelliject's device, including a detailed description of the structure and operation of the device as well as a comparison of the characteristics and design features of the device to other currently marketed epinephrine auto-injectors such as the EpiPen® Auto-Injector.  Plaintiffs' first substantive response to Intelliject's multiple letters was the filing of their complaint on January 19, 2011, despite having knowledge that the '432 patent was plainly not infringed by Intelliject's proposed device.  Intelliject is left to believe that Plaintiffs brought this action for the sole purpose of preventing Intelliject from bringing its device to market for thirty (30) months pursuant to 21 U.S.C. § 355.

Intelliject answers Plaintiffs' Complaint as follows:

## NATURE OF THE ACTION

1.      Admitted.

## THE PARTIES

2.      Intelliject has insufficient knowledge to admit or deny the allegations of paragraph 2, and therefore denies same.

3.      Intelliject has insufficient knowledge to admit or deny the allegations of paragraph 3, and therefore denies same.

4.      Intelliject admits that Meridian is the holder of approved New Drug Application No. 019430.  Except as so admitted, Intelliject is without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations contained in paragraph 4, and therefore denies same.

5.      Intelliject admits that the '012 Patent and the '432 Patent are listed in the Orange Book.  Intelliject is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in paragraph 5, and therefore denies same.

6.      Intelliject admits that it is a Delaware corporation with its principal place of business at 111 Virginia Street, Suite 405, Richmond, Virginia 23219 and that it intends to market and distribute an epinephrine auto-injector throughout the United States, but denies the remaining allegations contained in paragraph 6.

## JURISDICTION AND VENUE

7.      Intelliject admits that Plaintiffs base their claims under the patent laws of the United States of America.  Intelliject does not contest the Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

8.      Intelliject admits that this Court has personal jurisdiction over Intelliject because it is a Delaware corporation.  Except as so admitted, Intelliject denies the remaining allegations contained in paragraph 8.

9.      Intelliject admits that venue is proper in this judicial district.

## BACKGROUND

10.     Intelliject admits that the EpiPen® Auto-Injector may provide a dose of epinephrine for individuals needing protection from potentially fatal allergic reactions, but denies that the dose is either rapid or convenient.  Intelliject is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 10, and therefore denies same.

4

11.     Intelliject admits that NDA No. 019430 was approved by the FDA, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 11, and therefore denies same.

12.     Intelliject admits that the '432 Patent is entitled "Automatic Injector with Kickback Attenuation," that the patent issued on September 14, 2010, and that a copy of the patent is attached to the Complaint as Exhibit 1.  Intelliject denies that the '432 Patent was duly and legally issued.  Except as so admitted, Intelliject is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 12, and therefore denies same.

13.     Intelliject admits that the '432 Patent is listed in the Orange Book for EpiPen® Auto-Injectors but denies that the listing of the '432 patent in the Orange Book is proper.  Intelliject is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in paragraph 13, and therefore denies same.

14.     Admitted.

15.     Although the letter speaks for itself, Intelliject admits that on December 8, 2010, Intelliject sent a letter to Plaintiffs by certified mail stating that Intelliject had submitted to the FDA, and the FDA had filed, NDA No. 201739 concerning Intelliject's proposed device, epinephrine auto-injector 0.3 mg (epinephrine injection U.S.P 1:1000) and 0.15 mg (epinephrine injection U.S.P 1:1000), as required by § 505(b)(3)(B) of the FFDCA.  Intelliject is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in paragraph 15, and therefore denies same.

16.     Although the letter speaks for itself, Intelliject admits that its letter stated that the '432 patent was asserted to be invalid, unenforceable, or not infringed.  Intelliject further admits

that attached to the letter was Exhibit B, entitled "Intelliject's Detailed Statement of the Factual and Legal Bases Upon Which It Based Its Paragraph IV Certification to U.S. Patent No. 7,794,432," which provided a detailed statement of the factual and legal bases for why the '432 patent was not valid or would not be infringed by the manufacture, use, or sale of Intelliject's proposed device.  Intelliject is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in paragraph 16, and therefore denies same.

17.     Intelliject admits that the act of filing an NDA under § 505(b)(2) containing a Paragraph IV certification is a constructive act of infringement under 35 U.S.C. § 271(e)(2)(A), but denies any remaining allegations contained in paragraph 17.

18.     Intelliject admits that Plaintiffs have commenced this action within 45 days after the date on which they received Intelliject's Letter pursuant to § 505(b)(3)(B) of the FFDCA, and that the FDA's approval of Intelliject's device may be made effective upon the expiration of the thirty-month period beginning on the date Intelliject's letter was received or upon resolution of this litigation.  Intelliject denies any remaining allegations contained in paragraph 18.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 7,794,432 B2

19.     Intelliject repeats, reiterates, and realleges its responses to Paragraphs 1-18 above as if fully set forth herein.

20.     Intelliject admits that on the face of the '432 patent, Meridian is identified as the assignee of the '432 patent, but Intelliject is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 20, and therefore denies same.

21.     Intelliject admits that the act of filing an NDA under § 505(b)(2) containing a Paragraph IV certification is a constructive act of infringement under 35 U.S.C. § 271(e)(2)(A), but denies any remaining allegations contained in paragraph 21.

22.     Denied.

23.     Denied.

24.     Intelliject admits that if NDA No. 201739 is approved, Intelliject intends to engage in the manufacture, use, offer for sale, sale, and/or importation of Intelliject's device, with its proposed labeling.  Intelliject denies the remaining allegations contained in paragraph 24.

25.     Denied.

## COUNT II

## DECLARATORY JUDGMENT – U.S. PATENT NO. 7,794,432 B2

26.     Intelliject repeats, reiterates, and realleges its responses to Paragraphs 1-25 above as if fully set forth herein.

27.     Intelliject admits that it plans to commence commercial activities including the manufacture, use, offering to sell and sale of Intelliject's device upon approval of NDA No. 201739, but denies any remaining allegations contained in paragraph 27.

28.     Denied.

29.     Intelliject admits that it will begin the commercial manufacture, use, offering to sell, and sale of Intelliject's device after the FDA approves NDA No. 201739, but denies any remaining allegations contained in paragraph 29.

30.     Denied.

31.     Denied.

## FIRST AFFIRMATIVE DEFENSE

## NON-INFRINGEMENT

Intelliject's proposed epinephrine device does not infringe directly, indirectly, by inducement, literally or under the doctrine of equivalents, or in any other manner, any valid claim of U.S. Patent No. 7,794,432.

## SECOND AFFIRMATIVE DEFENSE

## INVALIDITY

The claims of U.S. Patent No. 7,794,432 are invalid for failing to meet the requirements of one or more of the provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## THIRD AFFIRMATIVE DEFENSE

## PATENT MISUSE

In asserting the claims of the '432 patent against Intelliject's proposed epinephrine device, Plaintiffs have engaged in patent misuse of the '432 patent so as to render it unenforceable, by impermissibly seeking to broaden the physical scope of the patent grant with anticompetitive effect.  Intelliject's device is lacking several of the limitations of the claims of the '432 patent, including, but not limited to, a cartridge that includes a needle assembly, a cartridge container including an opening therein sized to receive the needle there through during the medicament dispensing operation, a needle cover, and the limitation that residual force from the energy source after activation of the medicament dispensing operation is contained by the cartridge container, the cartridge, the housing, and the actuation assembly to prevent kickback of the auto-injector during the dispensing operation.  Assuming Plaintiffs conducted an investigation of Intelliject's device that had been provided to them by Intelliject prior to the filing of this lawsuit, Plaintiffs would have concluded that Intelliject's device was lacking these required elements of

8

the '432 patent claims.  Because this is such a clear case of non-infringement, no reasonable litigant could have realistically expected success on the merits and thus Plaintiffs' assertion of these claims against Intelliject is objectively baseless and an impermissible attempt to extend the rights of the '432 patent beyond those granted by the U.S. Patent and Trademark Office. Additionally, Plaintiffs have engaged in anticompetitive behavior with regard to the '432 patent by attempting to restrain Intelliject from the manufacture, use, offer for sale, sale, and/or importation of Intelliject's device for a thirty month period.  Plaintiffs have brought this suit to tortiously interfere with competition from Intelliject through the abuse of the litigation process. Plaintiffs undertook these acts of misuse with the purpose and effect of unlawfully extending the monopoly of the '432 patent beyond the scope of the patent grant.  Thus, Plaintiffs' actions have imposed an unreasonable restraint on competition and constitute a knowing, anticompetitive misuse of the '432 patent.

## **FOURTH AFFIRMATIVE DEFENSE**

## **INEQUITABLE CONDUCT**

The claims of U.S. Patent No. 7,794,432 are unenforceable because of Plaintiff Meridian's inequitable conduct, as alleged more specifically in Defendant's counterclaim set forth below.

## COUNTERCLAIMS

1.      Defendant and Counterplaintiff Intelliject, Inc. ("Intelliject") asserts these counterclaims against Plaintiffs and Counterdefendants King Pharmaceuticals, Inc. ("King") and Meridian Medical Technologies, Inc. ("Meridian") (collectively, "Plaintiffs" or "Counterdefendants") and avers as follows:

## JURISDICTION AND VENUE

2.      This action arises under the patent laws of the United States, 35 U.S.C. 1 §§ et seq.  This Court has original jurisdiction under 28 U.S.C. §§ 1331, 1338(a) and Fed. R. Civ. P. 13(a).  Intelliject seeks declaratory judgment pursuant to §§ 2201 and 2202 of Title 28 of the United States Code.

3.      There is an actual controversy within this judicial district arising under the patent laws of the United States, 35 U.S.C. 1 §§ et seq. between Counterplaintiff and Counterdefendants.  Plaintiffs initiated this action against Intelliject alleging infringement of U.S. Patent No. 7,794,432 ("'432 patent") by Intelliject's proposed epinephrine device.  An actual controversy exists at least by virtue of Plaintiffs' Complaint and Intelliject's Answer thereto, asserting non-infringement, invalidity and unenforceability of the '432 patent.

## PARTIES

4.      Intelliject is a Delaware corporation with its principal place of business at 111 Virginia Street, Suite 405, Richmond, Virginia 23219.

5.      Upon information and belief, King is a corporation organized under the laws of the State of Tennessee and has a place of business at 501 Fifth Street, Bristol, Tennessee 37620.

6.      Upon information and belief, Meridian is a Delaware corporation with its principal place of business at 10240 Old Columbia Road, Columbia, Maryland 21046.

## BACKGROUND

7.      Intelliject was founded by patients Eric and Evan Edwards for the purpose of creating a new device for delivering epinephrine to individuals experiencing severe allergic reactions.

8.      When approved by the U.S. Food and Drug Administration ("FDA"), Intelliject's innovative device will provide patients with a superior product that solves the problems not currently addressed by commercially available epinephrine auto-injectors such as the EpiPen® Auto-Injector, the product marketed by Plaintiffs.

9.      In short, Intelliject invented an "epi-Card" device that, when compared to Plaintiffs' EpiPen® product, has a smaller and highly portable shape that is the height and width of a credit card with the thickness of a cell phone.

10.     In addition, Intelliject's epi-Card device has a number of unique features, including compressed gas actuation, a retractable needle to eliminate unintentional injections, a non-coaxial design allowing for the thin card form factor, and the Intelliject Prompt System (iPS), an electronic system that provides audible instructions for use and visual cues to guide the patient or care provider through successful injection of epinephrine.

11.     As a result of Intelliject's research and development efforts, it has been awarded seven U.S. patents and has twelve pending U.S. patent applications for its medical injectors and methods of medicament delivery.

12.     Beginning in 2010, Intelliject began planning to seek formal approval for its device from the FDA.

13.     Meridian is the holder of approved New Drug Application No. 019430 ("Meridian's NDA"). Upon information and belief, pursuant to this NDA, Meridian developed,

11

manufactures and markets products with the proprietary names EpiPen® Auto-Injector and EpiPen Jr.® Auto-Injector, which contain 0.3 mg and 0.15 mg of epinephrine, respectively.

14.     U.S. Patent No. 7,449,012 (the "'012 patent"; Exhibit 2) and the '432 patent (Exhibit 1) are listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") in connection with Meridian's NDA.

15.     Because Meridian had listed its '012 patent in the Orange Book, on June 22, 2010, Intelliject informed Meridian, c/o King, of its intent to seek FDA approval and set forth the reasons why its device did not infringe the '012 patent. (See Exhibit 3).

16.     On August 20, 2010, Intelliject again contacted Meridian, c/o King, seeking a response to its June 22, 2010 letter. (See Exhibit 4).  There was no response to either letter.

17.     After becoming aware of the September 14, 2010 issuance of the '432 patent to Meridian, Intelliject sent another letter on September 30, 2010 to Meridian, c/o King, seeking a response to its previous letters and setting forth the reasons why its device did not infringe the '432 patent.  (See Exhibit 5).  Again, there was no response.

18.     On September 29, 2010, Intelliject submitted a New Drug Application ("NDA"), assigned No. 201739, with the FDA seeking approval for its device.  (See Exhibit 6).

19.     On December 8, 2010, the President and CEO of Intelliject sent a letter (Exhibit 7) to the legal department of Meridian, c/o King, regarding "Notice of NDA No. 201739 Concerning Epinephrine Auto-Injector Product With Paragraph IV Certification Concerning U.S. Patent Nos. 7,449,012 and 7,794,432."

20.     With this Paragraph IV Certification letter, Intelliject notified Meridian that the FDA had accepted for filing the NDA submitted by Intelliject seeking approval to engage in the

commercial manufacture, use, and sale of Intelliject's proposed epinephrine device prior to the expiration of the '012 and the '432 patents.

21.     Exhibits attached to that letter provided a detailed statement of the factual and legal bases establishing that the '012 and the '432 patents would not be infringed by the manufacture, use, or sale of Intelliject's proposed device and that the patents were invalid.  (See Exhibits 8 and 9).

22.     On January 4, 2011, King & Spalding, counsel for Plaintiffs, requested samples of Intelliject's epi-Card devices, which Intelliject provided the next business day.

23.     Upon information and belief, Plaintiffs and/or their counsel received the devices sent by Intelliject.

24.     Plaintiffs' counsel was also given access to information on Intelliject's device, including a detailed description of the structure and operation of the device as well as a comparison of the characteristics and design features of the device to other currently marketed epinephrine auto-injectors such as the EpiPen® Auto-Injector.

25.     Upon the expiration of the 45 day period pursuant to § 505(b)(3)(B) of the Federal Food, Drug, and Cosmetic Act, Plaintiffs filed this suit alleging patent infringement of the '432 patent by Intelliject's proposed epinephrine device.

26.     Plaintiffs' first substantive response to Intelliject's multiple letters was the filing of their complaint on January 19, 2011.

27.     As a result of the filing of this suit, Intelliject is prevented from introducing its proposed epinephrine device for a thirty-month period or until the district court finds there is no infringement of the '432 patent or that the '432 patent is invalid or otherwise unenforceable.

## COUNTERCLAIM 1

## NON-INFRINGEMENT OF THE '432 PATENT

28.     Intelliject repeats, reiterates, and realleges in this COUNTERCLAIM each and every allegation stated in paragraphs 1-27 above as if fully set forth herein.

29.     Intelliject's proposed epinephrine device does not, has not, and will not infringe any valid claim of the '432 patent directly, indirectly, by inducement, literally or under the doctrine of equivalents, or in any other manner.

30.     Intelliject seeks declaratory relief, pursuant to 28 U.S.C. § 2201, and the patent laws of the United States, adjudging that Intelliject's proposed epinephrine device does not, has not, and will not infringe the claims of the '432 patent directly, indirectly, by inducement, literally or under the doctrine of equivalents, or in any other manner.

## COUNTERCLAIM 2

## INVALIDITY OF THE '432 PATENT

31.     Intelliject repeats, reiterates, and realleges in this COUNTERCLAIM each and every allegation stated in paragraphs 1-30 above as if fully set forth herein.

32.     The '432 patent is invalid for failure to comply with one or more requirements, conditions, and provisions set forth in at least 35 U.S.C. §§ 101, 102, 103, and/or 112.

33.     Intelliject seeks declaratory relief, pursuant to 28 U.S.C. § 2201, and the patent laws of the United States, adjudging that the '432 patent is invalid.

## COUNTERCLAIM 3

## UNENFORCEABILITY OF THE '432 PATENT DUE TO PATENT MISUSE

34.     Intelliject repeats, reiterates, and realleges in this COUNTERCLAIM each and every allegation stated in paragraphs 1-33 above as if fully set forth herein.

35.     In asserting the claims of the '432 patent against Intelliject's proposed epinephrine device, Plaintiffs have engaged in patent misuse of the '432 patent so as to render it unenforceable by impermissibly seeking to broaden the physical scope of the patent grant with anticompetitive effect.

36.     Intelliject's proposed device is lacking several of the limitations of the claims of the '432 patent, including, but not limited to, a cartridge that includes a needle assembly, a cartridge container including an opening therein sized to receive the needle therethrough during the medicament dispensing operation, a needle cover, and the limitation that residual force from the energy source after activation of the medicament dispensing operation is contained by the cartridge container, the cartridge, the housing, and the actuation assembly to prevent kickback of the auto-injector during the dispensing operation.

37.     Assuming Plaintiffs conducted a rudimentary investigation of Intelliject's device that had been provided to them by Intelliject prior to the filing of this lawsuit, Plaintiffs would have concluded that Intelliject's device lacked these required limitations of the '432 patent claims.

38.     Because this is such a clear case of non-infringement, no reasonable litigant could have realistically expected success on the merits and thus Plaintiffs' assertion of these claims against Intelliject is objectively baseless and an impermissible attempt to extend the rights of the '432 patent beyond those granted by the U.S. Patent and Trademark Office.

39.     Additionally, Plaintiffs have engaged in anticompetitive behavior with regard to the '432 patent by attempting to restrain Intelliject from the manufacture, use, offer for sale, sale, and/or importation of Intelliject's proposed epinephrine device for a thirty month period.

40.     Plaintiffs have brought this suit to tortiously interfere with competition from Intelliject through abuse of the litigation process.

41.     Plaintiffs undertook these acts of misuse with the purpose and effect of unlawfully extending the monopoly of the '432 patent beyond the scope of the patent grant.

42.     Thus, Plaintiffs' actions have imposed an unreasonable restraint on competition and constitute a knowing, anticompetitive misuse of the '432 patent.

## COUNTERCLAIM 4

## UNENFORCEABILITY OF THE '432 PATENT DUE TO INEQUITABLE CONDUCT

43.     Intelliject repeats, reiterates, and realleges in this COUNTERCLAIM each and every allegation stated in paragraphs 1-42 above as if fully set forth herein.

44.     The '432 patent is entitled "Automatic Injector With Kickback Attenuation" and issued from Application Serial No. 11/923,729.  That application was filed on October 25, 2007 and was a continuation of the application that matured into the '012 patent.  The '432 patent issued on September 14, 2010 and indicates Meridian as the assignee on its face.

45.     The '012 patent is entitled "Automatic Injector" and issued from Application Serial No. 11/095,664.  That application was filed on April 1, 2005.  The '012 patent issued on November 11, 2008 and indicates Meridian as the assignee on its face.

46.     Both the '432 patent and the '012 patent identify the same individuals as inventors. The named inventors are as follows: Matthew Egerton Young; Sophie Rebecca Raven; Martin Joseph Murphy; Christopher John Hurlstone; Joseph William Daintrey; Craig Malcolm Rochford; Stephen Philip Kirkwood; Colin James Mathews; Robert L. Hill; and John Glyndwr Wilmot.

16

47.     The applications that matured into the '432 patent and the '012 patent were both examined by Assistant Examiner Deanna K. Hall and Primary Examiner Kevin C. Sirmons.

48.     All of the named inventors of the '432 patent signed a declaration under oath stating that:

> I acknowledge the duty to disclose information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, Section 1.56.

49.     The above oaths were made under penalty of civil and criminal penalties as follows:

> I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

50.     The duty to disclose material information that the inventors of the '432 patent swore to uphold is set out in Title 37, Code of Federal Regulations, Section Rule 1.56 and reads as follows:

> § 1.56 Duty to disclose information material to patentability.
>
> (a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned.
>
> . . . .
>
> However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

17

(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and

(2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

     (i) Opposing an argument of unpatentability relied on by the Office, or

     (ii) Asserting an argument of patentability.

A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

     (1) Each inventor named in the application;

     (2) Each attorney or agent who prepares or prosecutes the application; and

     (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

51.     The duty to disclose information material to patentability extends to each attorney or agent who prepares or prosecutes an application, and every other person who is substantively involved in the preparation or prosecution of the application.

18

52.     Attorney Garry J. Tuma of the Jones Day firm was involved in the prosecution of the applications that matured into the '432 patent and the '012 patent.

53.     Upon information and belief, during the prosecution of the '012 patent and of the '432 patent, Garry J. Tuma was an attorney registered to practice before the U.S. Patent and Trademark Office and was aware of his duty to disclose information material to patentability to the U.S. Patent and Trademark Office.

54.     The applicant(s), their attorney(s), or any person(s) associated with the preparation, filing, and/or prosecution of the application that matured into the '432 patent failed to disclose U.S. Patent No. 6,641,561 ("'561 patent") to the U.S. Patent and Trademark Office during prosecution of that application.

55.     The '561 patent is entitled "Drug Delivery Device" and has a filing date of July 3, 2001.  It issued on November 4, 2003 with Meridian identified as the assignee on the face of the patent.  The named inventors are Robert L. Hill, John G. Wilmot, and Steven Griffiths, the first two being named inventors of the '012 and the '432 patents.  The application that matured into the '561 patent was prosecuted by Pillsbury Winthrop LLP.

56.     The '561 patent would have been material to the claims pending in the application that matured into the '432 patent, including the following issued claims from the '432 Patent, for at least the following reasons:

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| 1. An auto-injector comprising: | The '561 patent discloses an auto-injector. *See, e.g.*, col. 3, lns. 3-5. |

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| a housing having a retention step formed on an inner surface of the housing, the housing having no surface operative to contact an injection site during a medicament dispensing operation; | The auto-injector disclosed in the '561 patent has a housing. *See, e.g.*, col. 3, lns. 16-17. |
| a cartridge having an opening therein and containing a medicament, the medicament rearwardly confined by a plunger received through the opening, the cartridge including a needle assembly operative to dispense the medicament there through during a medicament dispensing operation, the needle assembly including a needle; | The '561 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger. The '561 patent discloses that a needle assembly including a needle is coupled to the cartridge. *See, e.g.*, col. 2, lns. 11-14. |
| a cartridge container disposed within the housing and operative to receive the cartridge therein, the cartridge container having a ledge that abuts the retention step of the housing to limit movement of the cartridge container within the housing, | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| the cartridge container having a closed front end except for an opening therein sized to receive the needle there through during a medicament dispensing operation, the closed front end operative to engage the cartridge and oppose continued movement of the cartridge after the needle passes through the front end opening; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| an actuation assembly providing a stored energy source capable of driving the plunger within the cartridge to dispense the medicament through the needle assembly, the actuation assembly secured to the housing; and | The '561 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly.  The '561 patent discloses that the actuation assembly is secured to the housing. *See, e.g.*, col. 6, lns. 47-63. |
| a needle cover at least partially received within the housing and  positioned between the housing and the cartridge container, the needle cover having an opening formed therein sized to receive the needle there through during a medicament dispensing operation. | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| the needle cover having a first locked retracted position and a second locked extended position, the needle cover extending beyond the housing in the first locked retracted position; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| whereby: energy released from the stored energy source to drive the needle and cartridge during the medicament dispensing operation is not transmitted to the needle cover. | It would have been obvious to one skilled in the art to prevent force from being transmitted to a user during injection. For example, the '561 patent discloses dampening the force produced by the actuator by use of a rubber needle sheath. *See, e.g.*, col. 4, ln. 26; col. 6, lns. 54-56. Accordingly, the prevention of transmission of force to a needle cover would have been obvious to one skilled in the art at the time of the invention of the '432 patent. |
| 10. An auto-injector comprising: | The '561 patent discloses an auto-injector. *See, e.g.*, col. 3, lns. 3-5. |
| a housing; | The auto-injector disclosed in the '561 patent has a housing. *See, e.g.*, col. 3, lns. 16-17. |
| a cartridge having an opening therein and containing a medicament, the medicament rearwardly confined by a plunger received through the opening, the cartridge including a needle assembly operative to dispense the medicament there through during a medicament dispensing operation, the needle assembly including a needle; | The '561 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger. The '561 patent discloses that a needle assembly including a needle is coupled to the cartridge. *See, e.g.*, col. 2, lns. 11-14. |
| a cartridge container disposed within the housing and operative to receive the cartridge therein, the cartridge container having an annular structure that engages an inner surface of the housing to limit movement of the cartridge container within the housing, | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| the cartridge container having a closed front end except for an opening therein sized to receive the needle there through during the medicament dispensing operation, the closed front end operative to engage the cartridge and oppose continued movement of the cartridge after the needle passes through the front end opening; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| an actuation assembly providing a stored energy source capable of driving the plunger within the cartridge to dispense the medicament through the needle assembly, the actuation assembly secured to the housing; and | The '561 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly.  The '561 patent discloses that the actuation assembly is secured to the housing.  *See, e.g.*, col. 6, lns. 47-63. |
| a needle cover at least partially received within the housing and operative to receive therein at least the front end of the cartridge container, the needle cover having an opening formed therein sized to receive the needle there through during the medicament dispensing operation, | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| the needle cover having a first locked retracted position and a second locked extended position, the needle cover having a surface operative to contact an injection site prior to a medicament dispensing operation, the surface having the opening to receive the needle there through; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| whereby: residual force from the energy source after activation of the medicament dispensing operation is contained by the cartridge container, the cartridge, the housing, and the actuation assembly to prevent kickback of the auto-injector during the dispensing operation. | It would have been obvious to one skilled in the art to prevent force from being transmitted to a user during injection. For example, the '561 patent discloses dampening the force produced by the actuator by use of a rubber needle sheath.  *See, e.g.*, col. 4, ln. 26; col. 6, lns. 54-56. Accordingly, the prevention of transmission of force to a needle cover would have been obvious to one skilled in the art at the time of the invention of the '432 patent. |
| 19. An auto-injector comprising: | The '561 patent discloses an auto-injector. *See, e.g.*, col. 3, lns. 3-5. |
| a housing; | The auto-injector disclosed in the '561 patent has a housing.  *See, e.g.*, col. 3, lns. 16-17. |
| a cartridge having an opening therein and containing a medicament, the medicament rearwardly confined by a plunger, the cartridge including a needle assembly operative to dispense the medicament there through during a medicament dispensing operation, the needle assembly including a needle; | The '561 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger.  *See, e.g.*, col. 2, lns. 11-14. |

22

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| a cartridge container disposed within the housing and operative to receive the cartridge therein; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| an actuation assembly providing a stored energy source capable of driving the plunger within the cartridge to dispense the medicament through the needle assembly, the actuation assembly secured to the housing; and | The '561 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly.  The '561 patent discloses that the actuation assembly is secured to the housing.  *See, e.g.*, col. 6, lns. 47-63. |
| a needle cover at least partially received within the housing and positioned between the housing and the cartridge container, | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| the needle cover having an opening formed therein, the needle cover having a first locked retracted position and a second locked extended position,  the needle cover extending beyond the housing in the first locked retracted position; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| wherein: the housing has no surface operative to contact an injection site; and | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| energy released from the stored energy source to drive the needle during the medicament dispensing operation is not transferred to the needle cover. | It would have been obvious to one skilled in the art to prevent force from being transmitted to a user during injection.  For example, the '561 patent discloses dampening the force produced by the actuator by use of a rubber needle sheath.  *See, e.g.*, col. 4, ln. 26; col. 6, lns. 54-56.   Accordingly, the prevention of transmission of force to a needle cover would have been obvious to one skilled in the art at the time of the invention of the '432 patent. |
| 20. A method of attenuating kickback in an auto-injector, the method comprising: | The '561 patent discloses an auto-injector and associated method of use. *See, e.g.*, col. 3, lns. 3-5. |
| securing an actuation assembly to a housing, the actuation assembly comprising a stored energy source; | The '561 patent discloses an actuation assembly providing a stored energy source.  The '561 patent discloses that the actuation assembly is secured to the housing.  *See, e.g.*, col. 6, lns. 47-63. |

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| receiving a cartridge within a cartridge container, the cartridge including a needle assembly that includes a needle, the cartridge container having a front end; | The '561 patent discloses a cartridge. The '561 patent discloses that a needle is coupled to the cartridge. *See, e.g.*, col. 2, lns. 11-14. |
| receiving the cartridge container within the housing; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| receiving a needle cover within the housing, the needle cover extending beyond the housing and having an end surface operative to contact an injection site prior to a medicament dispensing operation, the needle cover operative to receive the front end of the cartridge container; and | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| containing residual force from the stored energy source within the cartridge container, the cartridge, the housing, and the actuation assembly after activating the auto-injector to prevent transfer of the residual force to the needle cover. | It would have been obvious to one skilled in the art to prevent force from being transmitted to a user during injection. For example, the '561 patent discloses dampening the force produced by the actuator by use of a rubber needle sheath. *See, e.g.*, col. 4, ln. 26; col. 6, lns. 54-56.  Accordingly, the prevention of transmission of force to a needle cover would have been obvious to one skilled in the art at the time of the invention of the '432 patent. |
| 21. An auto-injector comprising: | The '561 patent discloses an auto-injector. *See, e.g.*, col. 3, lns. 3-5. |
| a housing; | The auto-injector disclosed in the '561 patent has a housing.  *See, e.g.*, col. 3, lns. 16-17. |
| a cartridge having an opening therein and containing a medicament, the medicament rearwardly confined by a plunger, the cartridge including a needle assembly operative to dispense the medicament there through during a medicament dispensing operation, the needle assembly including a needle; | The '561 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger. The '561 patent discloses that a needle assembly including a needle is coupled to the cartridge.  *See, e.g.*, col. 2, lns. 11-14. |
| a cartridge container disposed within the housing and operative to receive the cartridge therein; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |

| U.S. Patent No. 7,794,432 | The '561 patent |
|---|---|
| an actuation assembly providing a stored energy source capable of driving the plunger within the cartridge to dispense the medicament through the needle assembly, the actuation assembly secured to the housing; and | The '561 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly, and that the actuation assembly is secured to the housing. *See, e.g.*, col. 6, lns. 47-63. |
| a needle cover at least partially received within the housing and positioned between the housing and the cartridge container, the needle cover having an opening formed therein, | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| the needle cover having a first locked retracted position and a second locked extended position, the needle cover extending beyond the housing in the first locked retracted position; | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| wherein: the needle cover has a surface operative to contact an injection site prior to a medicament dispensing operation; and | The '561 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| energy released from the stored energy source to drive the needle during the medicament dispensing operation is not transferred to the needle cover. | It would have been obvious to one skilled in the art to prevent force from being transmitted to a user during injection. For example, the '561 patent discloses dampening the force produced by the actuator by use of a rubber needle sheath. *See, e.g.*, col. 4, ln. 26; col. 6, lns. 54-56. Accordingly, the prevention of transmission of force to a needle cover would have been obvious to one skilled in the art at the time of the invention of the '432 patent. |

57. Since Robert L. Hill and John G. Wilmot were named inventors on the '561 patent, these individuals knew of the '561 patent and its disclosure.

58. Upon information and belief, Robert L. Hill and John G. Wilmot knew of the materiality of the '561 patent to the claims pending in the application that matured to the '432 patent.

59.     The '561 patent was not disclosed by Robert L. Hill or John G. Wilmot to the U.S. Patent and Trademark Office during the pendency of the application that matured into the '432 patent.

60.     The '561 patent was also known to attorney Garry J. Tuma during the pendency of the application that matured into the '432 patent because Mr. Tuma was associated or substantively involved in the prosecution of other patent applications assigned to Meridian in which the '561 patent was cited to the U.S. Patent and Trademark Office by the applicant.

61.     The law firm of Jones Day, and specifically Mr. Tuma, was responsible for the prosecution of other patent applications assigned to Meridian, including the applications that matured into U.S. Patent Nos. 7,544,189; 7,635,348; 7,678,073; and 7,757,370.

62.     These other Meridian applications were directed to subject matter that is similar to the subject matter of the '432 patent.

63.     U.S. Patent No. 7,544,189 ("the '189 patent") entitled "Needle And Hub Assembly For Automatic Injectors" was filed on March 11, 2004 and issued as a patent on June 9, 2009.   Attorney Garry J. Tuma was associated with or substantively involved in the prosecution of the '189 patent.   During the prosecution of the '189 patent, the '561 patent was cited to the U.S. Patent and Trademark Office by the applicant on August 12, 2004.

64.     U.S. Patent No. 7,635,348 ("the '348 patent") entitled "Container for Medicament Automatic Injector and Automatic Injector Adapted Therefor" was filed on November 2, 2004 and issued as a patent on December 22, 2009.   Six of the seven named inventors of the '348 patent– Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin James Mathews; Joseph William Daintrey; and John G. Wilmot –are also named inventors of the '012 and '432 patents.   Attorney Garry J. Tuma was associated with or

26

substantively involved in the prosecution of the '348 patent.   During the prosecution of the '348 patent, the '561 patent was cited to the U.S. Patent and Trademark Office by the applicant on November 2, 2004.

65.     U.S. Patent No. 7,678,073 ("the '073 patent") entitled "Vortex Feature for Drug Delivery System" was filed on August 29, 2007 and issued as a patent on March 16, 2010. Robert L. Hill, one of the three named inventors of the '073 patent, is also a named inventor of the '012 and '432 patents.  Attorney Garry J. Tuma was associated with or substantively involved in the prosecution of the '073 patent.  During the prosecution of the '073 patent, the '561 patent was cited to the U.S. Patent and Trademark Office by Mr. Tuma on August 29, 2007.

66.     U.S. Patent No. 7,757,370 ("the '370 patent") entitled "Method of Forming A Needle And Hub Assembly For Automatic Injectors" was filed on April 29, 2009 and issued as a patent on July 20, 2010.  Attorney Garry J. Tuma was associated with or substantively involved in the prosecution of the '370 patent.  During the prosecution of the '370 patent, the '561 patent was cited to the U.S. Patent and Trademark Office by Mr. Tuma on April 29, 2009.

67.     From the prosecution of the above-mentioned Meridian applications and the fact that he cited the '561 patent in at least two of these applications, the '561 patent was known to Mr. Tuma.

68.     Upon information and belief, Mr. Tuma knew that the '561 patent was material to the patentability of the claims pending in the '432 patent.

69.     Mr. Tuma did not disclose the '561 patent to the U.S. Patent and Trademark Office during the pendency of the application that matured into the '432 patent.

70.     Upon information and belief, the '561 patent was also known to inventors John G. Wilmot; Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin

James Mathews; Joseph William Daintrey; and Robert L. Hill.  These individuals were named inventors on the '432 patent and named inventors on either the '073 patent or the '348 patent, during whose prosecution the '561 patent was cited.

71.     Upon information and belief, these inventors were associated with or substantively involved in the prosecution of the '073 patent or the '348 patent and thus were familiar with the references cited therein.

72.     None of the inventors disclosed the '561 patent to the U.S. Patent and Trademark Office during the prosecution of the '432 patent.

73.     From the time of the filing of the application that matured into the '432 patent through issuance by the U.S. Patent and Trademark Office of the '432 patent, each individual associated with the filing or prosecution of that application, including but not limited to attorney Garry J. Tuma and inventors John G. Wilmot; Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin James Mathews; Joseph William Daintrey; and Robert L. Hill, had a duty of candor and good faith to disclose to the U.S. Patent and Trademark Office all information known to that individual that is material to patentability, pursuant to U.S. patent laws and regulations, including 37 C.F.R. § 1.56(a).

74.     Failure to disclose the '561 patent to the U.S. Patent and Trademark Office was an omission by each of these individuals in contravention of their duties to the U.S. Patent and Trademark Office during the prosecution of the '432 patent.

75.     Upon information and belief, each of these individuals had knowledge of, and intentionally withheld, the '561 patent from the U.S. Patent and Trademark Office with intent to deceive the U.S. Patent and Trademark Office.

28

76.     These omissions were in contravention of these individuals' duties to the U.S. Patent and Trademark Office during the prosecution of the '432 patent.

77.     These omissions were material to patentability because, among other things, they were relevant to the questions of whether the claims of the '432 patent would have been novel or obvious to one of ordinary skill in the art and because there is a substantial likelihood that a reasonable examiner would have considered the '561 patent important in deciding whether to allow the '432 patent and because this reference either alone or in combination with other art such as PCT Publication WO 03/011378; U.S. Patent No. 6,210,369; or U.S. Patent No. 6,805,686, teach or imply elements of, or render obvious, various claims in the '432 patent.

78.     For each of the aforesaid reasons, Intelliject is entitled to a declaratory judgment that the '432 patent is unenforceable due to inequitable conduct.

79.     The applicant(s), their attorney(s), or the person(s) associated with or substantively involved with the preparation, filing, and/or prosecution of the application that matured into the '012 patent failed to disclose U.S. Patent No. 6,210,369 ("the '369 patent") to the U.S. Patent and Trademark Office.

80.     The '369 patent is entitled "Automatic Injector" and has a filing date of December 16, 1998.  It issued on April 3, 2001 with Meridian identified as the assignee on the face of the patent.  The named inventors are John G. Wilmot, Jeffrey L. Goldberg, Jon Page, Cliff Ketcham, Jeffrey P. Castleberry, Jason Morton, Dave Edsall, Robert R. Boyd, and Robert L. Hill, with Wilmot and Hill being named inventors of the '012 and the '432 patents.  The application that matured into the '369 patent was prosecuted by Pillsbury Madison & Sutro.

81.     The '369 patent would have been material to the claims pending in the application that matured into the '012 patent, including the following issued claims from the '012 Patent, for at least the following reasons:

| U.S. Patent No. 7,449,012 | The '369 patent |
|---|---|
| 1. An auto-injector comprising: | The '369 patent discloses an autoinjector. *See, e.g.*, col. 7, ln. 49. |
| A housing; | The auto-injector disclosed in the '369 patent has a housing. *See, e.g.*, col. 7, lns. 51-54. |
| A cartridge container disposed within the housing; | The '369 patent discloses a cartridge container disposed within the housing. *See, e.g.*, col. 7, lns. 59-62. |
| A cartridge received within the cartridge container, the cartridge having at least one opening therein and containing a medicament, the medicament rearwardly confined by a plunger, | The '369 patent discloses that the cartridge is received within the cartridge container. The '369 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger. *See, e.g.*, col. 8, lns. 3-5 and 29-33. |
| Wherein the cartridge includes a needle assembly to dispense the medicament there through, the needle assembly   comprising a needle and a nonremovable protective needle sheath; | The '369 patent discloses that a needle is coupled to the cartridge container. *See, e.g.*, col. 7, lns. 59-62; col. 8, lns. 53-54. |
| An actuation assembly providing a stored energy source capable of being  released to drive the needle through the protective needle sheath and to drive the plunger within the cartridge to dispense the medicament through the needle assembly; | The '369 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly. *See, e.g.*, col. 11, lns. 26-36; col. 15, lns. 46-51. |
| A needle cover received within the housing, the needle cover having an opening formed therein to permit the passage of the needle assembly there through during a medicament dispensing operation, | The '369 patent discloses a needle cover received with the housing. The needle cover includes an opening configured to receive a needle therethrough during a medicament dispensing operation. *See, e.g.*, col. 15, lns. 28-31. |
| The needle cover having a first locked position whereby the needle cover is in a locked retracted position prior to activation of the autoinjector, | The '369 patent discloses that the needle cover is in a first locked position in which it is retracted prior to activation of the auto-injector. *See, e.g.*, col. 13, lns. 13-44; col. 15, ln. 62- col. 16, ln. 13. |

| U.S. Patent No. 7,449,012 | The '369 patent |
|---|---|
| The needle cover having a second locked position whereby the needle cover is in a locked extended position after operation of the autoinjector; | The '369 patent discloses that the needle cover is in a second locked position in which it is extended after operation of the auto-injector. *See, e.g.*, col. 13, ln. 13-44; col. 15, ln. 62- col. 16, ln. 13. |
| A first locking assembly that holds the needle cover in the first locked position; and a second locking assembly that holds the needle cover in the second locked position. | The '369 patent discloses a first locking assembly that holds the needle cover in the first locked position and a second locking assembly that holds the needle cover in the second locked position. *See, e.g.*, col. 15, ln. 67- col. 16, ln. 13; see also figures 2 and 6. |
| 55. An auto-injector comprising: | The '369 patent discloses an autoinjector. *See, e.g.*, col. 7, ln. 49. |
| A housing; | The auto-injector disclosed in the '369 patent has a housing. *See, e.g.*, col. 7, ln. 49. |
| A cartridge container disposed within the housing; | The '369 patent discloses a cartridge container disposed within the housing. *See, e.g.*, col. 7, lns. 59-62. |
| A cartridge received within the cartridge container, the cartridge having at least one opening therein and containing a medicament, the medicament rearwardly confined by a plunger, | The '369 patent discloses a cartridge received within the cartridge container. The '369 patent discloses that the cartridge has at least one opening therein and contains a medicament, which is rearwardly confined by a plunger. *See, e.g.*, col. 8, lns. 3-5 and 29-33. |
| Wherein the cartridge includes a needle assembly to dispense the medicament there through, the needle assembly comprising a needle and a nonremovable protective needle sheath; | The '369 patent discloses that a needle is coupled to the cartridge container. *See, e.g.*, col. 7, lns. 59-62; col. 8, lns. 53-54. |
| An actuation assembly providing a stored energy source capable of being released to drive the needle through the protective needle sheath and to drive the plunger within the cartridge to dispense the medicament through the needle assembly; | The '369 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly. *See, e.g.*, col. 11, ln. 26-36; col. 15, lns. 46-51. |
| A needle cover at least partially received within the housing, the needle cover having an opening formed therein sized to permit the passage of the needle assembly there through during a medicament dispensing operation, | The '369 patent discloses a needle cover received at least partially with the housing. The needle cover includes an opening to receive a needle therethrough during a medicament dispensing operation. *See, e.g.*, col. 15, lns. 28-31. |

| U.S. Patent No. 7,449,012 | The '369 patent |
|---|---|
| The needle cover having a first locked retracted position | The '369 patent discloses that the needle cover has a first locked position in which it is retracted prior to activation of the auto-injector. *See, e.g.*, col. 13, lns. 13-44; col. 15, ln. 62- col. 16, ln. 13. |
| And a second locked extended position; and | The '369 patent discloses that the needle cover has a second locked position in which it is extended after operation of the auto-injector. *See, e.g.*, col. 13, lns. 13-44; col. 15, ln. 62- col. 16, ln. 13. |
| A locking mechanism for selectively holding the needle cover in the first locked  position and in the second locked position, | The '369 patent discloses a locking mechanism that holds the needle cover in the first locked position and the second locked position. *See, e.g.*, col. 15, ln. 67- col. 16, ln. 13; *see also* figures 2 and 6. |
| Wherein the locking  mechanism is constructed and arranged to be protected against external contact by at least one of the needle cover and the housing. | The '369 patent discloses that the locking mechanism is disposed entirely within the housing of the autoinjector. *See, e.g.*, col. 15, ln. 67- col. 16, ln. 13; *see also* figures 2 and 6. |
| 66. An auto-injector comprising: | The '369 patent discloses an auto-injector. *See, e.g.*, col. 7, ln. 49. |
| A housing; | The auto-injector disclosed in the '369 patent has a housing. *See, e.g.*, col. 7, lns. 59-62. |
| A cartridge container disposed within the housing; | The '369 patent discloses a cartridge container disposed within the housing. *See, e.g.*, col. 7, lns. 59-62. |
| A cartridge received within the cartridge container, the cartridge having at least one opening therein and containing a medicament, the medicament rearwardly confined by a plunger, | The '369 patent discloses a cartridge that is received within the cartridge container, has at least one opening therein, and contains a medicament, which is rearwardly confined by a plunger. *See, e.g.*, col. 8, lns. 3-5 and 29-33. |
| The cartridge includes a needle assembly to dispense the medicament there through; | The '369 patent discloses that a needle is coupled to the cartridge container. *See, e.g.*, col. 7, lns. 59-62; col. 8, lns. 53-54. |
| An actuation assembly having a stored energy source capable of being released to drive the plunger within the cartridge to dispense the medicament through the needle assembly; | The '369 patent discloses an actuation assembly providing a stored energy source capable of being released to drive the needle and the plunger to dispense the medicament through the needle assembly.  *See, e.g.*, col. 11, lns. 26-36; col. 15, lns. 46-51. |

| U.S. Patent No. 7,449,012 | The '369 patent |
|---|---|
| A needle cover at least partially received within the housing, the needle cover having an opening formed therein to permit the passage of the needle assembly there through during a medicament dispensing operation, | The '369 patent discloses a needle cover received at least partially with the housing, the needle cover including an opening configured to receive the needle therethrough during a medicament dispensing operation. *See, e.g.*, col. 15, lns. 28-31. |
| The needle cover having a first locked retracted position | The '369 patent discloses that the needle cover has a first locked position in which it is retracted. *See, e.g.*, col. 13, lns. 13-44; col. 15, ln. 62- col. 16, ln. 13. |
| And a second locked extended position; and | The '369 patent discloses that the needle cover has a second locked position in which it is extended. *See, e.g.*, col. 13, lns. 13-44; col. 15, ln. 62- col. 16, ln. 13. |
| A locking mechanism for selectively holding the needle cover in the first locked position and in the second locked position, wherein: | The '369 patent discloses a locking mechanism that holds the needle cover in the first locked position and the second locked position. *See, e.g.*, col. 15, ln. 67- col. 16, ln. 13; *see also* figures 2 and 6. |
| The locking mechanism comprises at least one locking tooth that releasably engages the needle cover; | The '378 publication and the '686 patent each disclose a locking mechanism that includes a locking tooth that releasably engages the needle cover. *See, e.g.*, col. 15, ln. 67- col. 16, ln. 13; *see also* figures 2 and 6. |
| Each locking tooth has a spring action extension that adjusts the position of the locking tooth with respect to the cartridge to accommodate cartridges of different sizes and of different needle sizes received within the cartridge container; and | The '369 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |
| Each locking tooth is pivotally connected to the cartridge container. | The '369 patent, taken in combination with other references, renders this element obvious under 35 U.S.C. § 103. |

82.     Due to the fact that Robert L. Hill and John G. Wilmot were named inventors on the '369 patent, these individuals knew of the '369 patent and its disclosure.

83.     Upon information and belief, Robert L. Hill and John G. Wilmot knew of the materiality of the '369 patent to the patentability of the claims pending in the application that matured into the '012 patent.

33

84. The '369 patent was not disclosed by Robert L. Hill or John G. Wilmot to the U.S. Patent and Trademark Office during the pendency of the application that matured into the '012 patent.

85. The '369 patent was also known to Mr. Tuma from the prosecution of the '348 patent. During the prosecution of the application that led to the '348 patent, the '369 patent was used as a basis for a number of claim rejections.

86. On October 5, 2007, an Office Action was issued in the prosecution of the '348 patent and included rejections based upon the '369 patent. The rejections based upon the '369 patent stated as follows:

> Claims 19-22, 24, 26, 28-29, 32, 34-35 are rejected under 35 U.S.C. 102(b) as being anticipated by Wilmot et al. (U.S. 6,210,369).
> Wilmot discloses a container comprising: an open end; a closed end opposite the open end; a cap 182 constructed and arranged to releasable engage the open end so as to releasable close the open end (Figs. 1 or 7-11); a needle retainer 56 mounted within the container proximate to the closed end (Figs 2-5). It is noted that the needle retainer 56 includes hub assembly 18, spring 94, adhesive 88, O-ring seal 82; the needle retainer formed of a resilient material; a shield 9, 92 mounted within the container; the shield further comprises an upwardly extending portion; the container 12 formed of a light permeable material (such as plastic member) closed end of the container is outwardly rounded; anti-roll protrusions (194) provided on an exterior surface (see Figs. 7-9).
>
> . . . .
>
> Claims 30-31 are rejected under 35 U.S.C. 102(b) as being anticipated by Wilmot et al. (U.S. 6,210,369) in view of Bhitiyakul (U.S. 5,941,854).
> Wyrick discloses all claimed invention except for a vent opening in the container nor needle retainer includes one or more vents.
> Bhitiyakul discloses a vent opening 63 in the container to allow escape of air.
> It would have been obvious at the time the invention was made to a person having ordinary skill in the art to modify the device of Wyrick with vent - openings, as taught by Bhitiyakul, in order for allowing for escape of as out from the container or the needle retainer.

87.     On November 28, 2007, Mr. Tuma filed a response to the rejections based upon

the '369 patent.   Mr. Tuma's response substantively discussed the '369 patent.   Mr. Tuma's

response stated:

> Claims 19-22, 24, 26, 28, 29, 32, 34, and 35 were rejected under 35 U.S.C.
> § 102(b) as being anticipated by Wilmot '369.   Dependent claim 23 was rejected
> under 35 U.S.C. § 103(a) as being obvious from Wyrick.   And dependent claims
> 30 and 31 were rejected under 35 U.S.C. § 103(a) as being obvious from Wilmot
> '369 in view of Bhitiyakul.
>
> These rejections are respectfully traversed.
>
> Independent claims 19 and 34 are directed to a <u>container</u> for an automatic
> injector.   Applicants have amended claims 19 and 34 to make that more clear by
> requiring the container to have one or more interior walls forming a hollow
> interior sized and configured to completely receive therein an automatic injector
> through the open end.
>
> Wilmot '369 is directed to an automatic injector and <u>not</u> a container for an
> automatic injector.
>
> Wilmot '369 therefore does not anticipate amended independent claims 19
> and 34, which should now be allowable.
>
> For at least this reason, dependent claims 20-24, 26, 28-32, and 35, which
> depend from independent claim 19 or 34, are also not anticipated by or obvious
> from Wilmot '369, Wyrick, or Wilmot '369 in combination with Bhitiyakul.
>
> Accordingly, applicants respectfully request that the rejections of claims
> 19-24, 26, 28-32, 34, and 35 under 35 U.S.C. §§ 102(b) and 103(a) be withdrawn.

88.     On December 31, 2007, the Office issued a Final Rejection, which also included

the rejections based on the '369 patent.   The rejections stated:

> Claims 19-22, 24, 26, 28-29, 32-35, 41-43, 48-50 are rejected under 35
> U.S.C. 102(b) as being anticipated by Wilmot et al. (U.S. 6,210,369).
>
> Wilmot discloses a container comprising: interior walls forming a hollow
> interior sized and configured to receive an automatic injector (such as a housing is
> covering an automatic injector, Figs. 1-11); an open end; a closed end opposite
> the open end; a cap 182 constructed and arranged to releasable engage the open
> end so as to releasable close the open end (Figs. 1 or 7-11); a needle retainer 56
> mounted within the container proximate to the closed end (Figs. 2-5).   It is noted
> that the needle retainer 56 includes hub assembly 18, spring 94, adhesive 88, O-
> ring seal 82; the needle retainer formed of a resilient material; a shield 9, 92
> mounted within the container; the shield further comprises an upwardly extending
> portion; the container 12 formed of a light permeable material (such as plastic
> member); closed end of the container is outwardly rounded; anti-roll protrusions
> (194) provided on an exterior surface (see Figs. 7-9).

Regarding claims 33, 41-43, 48-50, they encompass the same scope of the invention as to that of claims 19-22, 24, 26, 28-29, 32, 35-35 except they are drafted in method format instead of apparatus format.   The claim(s) is/are therefore rejected for the same reason as set forth above.

. . . .

Claims 30-31, 41 are rejected under 35 U.S.C. 102(b) as being anticipated by Wilmot et al. (U.S. 6,210,369) in view of Bhitiyakul (U.S. 5,941,854).

Wyrick discloses all claimed invention except for a vent opening in the container nor needle retainer includes one or more vents.

Bhitiyakul discloses a vent opening 63 in the container to allow escape of air.

It would have been obvious at the time the invention was made to a person having ordinary skill in the art to modify the device of Wyrick with vent – openings, as taught by Bhitiyakul, in order for allowing for escape of as out from the container or the needle retainer.

### *Response to Arguments*

Applicant's arguments filed 11/28/07 have been fully considered but they are not persuasive.

1) Applicant argues that the plunger is visible through more than the container and the housing of the automatic injector.

In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., **plunger** is visible through more than the container and the housing of the automatic injector) are not recited in the rejected claim(s).   Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims.   See *In re Van Geuns*, 988 F.2d 1181, 26 U.S.PQ2d 1057 (Fed. Cir. 1993).

2) Applicant argues that the Wilmot '369 is directed to an automatic injector and not a container for an automatic injector.

In response, device of Wilmot clearly shows a container/housing 12 (Figs. 1-11).   If an automatic injector does not have a container, how it can be able to hold the automatic injector parts together?

89.   On February 13, 2008, Mr. Tuma filed a Response After Final Rejection and addressed the Patent Office's rejections based on the '369 patent.   Mr. Tuma's response substantively discussed the '369 patent.   Mr. Tuma's comments relating to the '369 patent are as follows:

Claims 19-22, 24, 26, 28, 29, 32-35, 41-43, and 48-50 were rejected under 35 U.S.C. § 102(b) as being anticipated by Wilmot '369.  Dependent claim 23 was rejected under 35 U.S.C. § 103(a) as being obvious from Wyrick.  And dependent claims 30, 31, and 41 were rejected under 35 U.S.C. § 103(a) as being obvious from Wilmot '369 in view of Bhitiyakul.

These rejections are respectfully traversed.

Independent claims 19, 33, and 34 are directed to a <u>container</u> for an automatic injector.

Wilmot '369 is directed to an automatic injector and <u>not</u> a container for an automatic injector.

The Examiner said the "device of Wilmot clearly shows a container/housing 12 (Figs. 1-11).  If an automatic injector does not have a container, how it can be able to hold the automatic injector parts together?" FOA, page 6.

The Examiner has misunderstood applicants' invention.  A <u>container</u> for an automatic injector is <u>not</u> the same as the <u>housing</u> of an automatic injector.  <u>They are different structures</u>.

The "housing" is the outer body of the automatic injector.  It is the <u>part</u> of the automatic injector that "hold[s] the [other] automatic injector parts together."

The "container" is a separate structure for receiving and holding an automatic injector therein to protect the injector from damage to keep the injector clean before use and to protect users from the injector's exposed needle after use.

Applicants' specification clearly defines and distinguishes these terms:

"A typical automatic injector has a <u>housing</u>…." Paragraph 4, line 1; emphasis added.

"Automatic injectors are typically packaged in <u>containers</u> to keep them clean and protect them from damage." Paragraph 5, lines 1-2; emphasis added.

"One aspect of the invention relates to an automatic injector package.  The …package comprises an automatic injector, a <u>container</u>, and indicia.  The automatic injector includes a <u>housing</u>, a cartridge assembly carried within the <u>housing</u>, a needle assembly …. and an actuation assembly carried by the <u>housing</u> …. The <u>container</u> is constructed and arranged to receive the automatic injector before and after use." Paragraph 6, lines 1-9; emphasis added.

"FIGURE 4 is a … view of the <u>container 10</u> showing an automatic injector 50 installed therein."  Paragraph 44, lines 1-2; emphasis added.  "The automatic injector 50 has an outer <u>housing 52</u> . . . ."  Paragraph 45, line 6; emphasis added.

FIGURE 9A shows the <u>container 200</u> with an exemplary automatic injector 202 . . . ; FIGURE 9B shows the <u>container 200</u> . . . without the automatic injector 202."  Paragraph 62, lines 3-5; emphasis added.

"<u>Containers</u> for automatic injectors and automatic injectors adapted for those containers are disclosed.  The <u>containers</u> include structures adapted for those containers are disclosed.  The <u>containers</u> include structures adapted to retain and, optionally, cripple the needle of the automatic injector when the automatic injector is inserted into the container after use."  Abstract, lines 1-4; emphasis added.

Moreover, as plainly recited in independent claim 1, the housing and container are different elements of the automatic injector package. In particular, the housing forms a <u>part</u> of the automatic injector: "an automatic injector including a housing," and the container is "constructed and arranged to <u>receive</u> the automatic injector before and after use" (emphasis added).

In sum, applicants' specification, drawings, and claims make abundantly clear that the <u>housing</u> of an automatic injector is <u>not</u> the same as a <u>container</u> for an automatic injector.

Furthermore, independent claims 19, 33, and 34 each require a container having an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> completely therein through the open end. Note that the claims require an automatic injector and <u>not</u> just internal parts or assemblies of an automatic injector. Note further that an automatic injector includes a housing -- even Wilmot '369 defines its auto-injector 10 as including a housing:

"The auto-injector 10 is generally comprised of a forward housing member 12 and a rearward housing member 14 connected together to define a <u>housing</u> . . . . "Wilmot '369, column 7, lines 51-53; emphasis added.

Wilmot '369 discloses that its forward housing member 12 and rearward housing member 14 together are sized and configured to contain various <u>internal assemblies</u> of an automatic injector:

"[F]orward housing member 12 . . . contains a dental cartridge assembly . . . and a needle assembly . . . . "Wilmot '369, column 7, lines 59-62.

"The rearward housing member 14 . . . contain[s] a manually operable drive assembly . . . ." *Id*. at lines 63-66.

Nowhere does Wilmot '369 disclose that its housing members 12 and 14 have an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> (with its own housing) completely therein through the open end. Housing member 12 and 14 are sized and configured to receive therein cartridge, needle, and drive assemblies - - <u>not</u> an automatic injector.

Wilmot '369 therefore does not anticipate independent claims 19, 33, and 34, which should be allowable.

For at least this reason, dependent claims 20-24, 26, 28-32, 35, 41-43, and 48-50, which depend from independent claim 19, 33, or 34, are also not anticipated by or obvious from Wilmot '369, Wyrick, or the combination of Wilmot '369 and Bhitiyakul.

Accordingly, applicants respectfully request that the rejections of claims 19-24, 26, 28-35, 41-43, and 48-50 under 35 U.S.C. §§ 102(b) and 103(a) be withdrawn.

90. On May 27, 2008, Mr. Tuma filed a Request for Continued Examination with a

Reply to Advisory Action and included comments directed to the '369 patent. Mr. Tuma's Reply

substantively discussed the '369 patent.  In the Reply, Mr. Tuma made the following comments with respect to the '369 patent:

> Claims 19-22, 24, 26, 28, 29, 32-35, 41-43, and 48-50 were rejected under 35 U.S.C. § 102(b) as being anticipated by Wilmot '369.  Dependent claim 23 was rejected under 35 U.S.C. § 103(a) as being obvious from Wyrick.  And dependent claims 30, 31, and 41 were rejected under 35 U.S.C. § 103(a) as being obvious from Wilmot '369 in view of Bhitiyakul.
>
> These rejections are respectfully traversed.
>
> In the RFOA, applicants explained that the independent claims 19, 33, and 34 are directed to a <u>container</u> for an automatic injector, while Wilmot '369 is directed to an automatic injector and <u>not</u> a container for an automatic injector. Applicants suggested that the Examiner misunderstood applicants' invention, pointing out that a container for receiving an automatic injector is not the same as the housing of an automatic injector.
>
> The Examiner responded in the Advisory Action by saying "Examiner clearly understood Applicant meant such as housing and the container are separate elements.  However, in claims 19, 33, Applicant does not clearly recite that the housing and the container are separate structures" (page 2, paragraph 2).
>
> Applicants submit that such a recitation is <u>not</u> at all necessary because none of claims 19, 33, or 34 recites a housing.
>
> Moreover, "applicants are their own lexicographers" MPEP § 2173.01.
>
> As discussed previously in the RFOA, applicants' specification, drawings, and claims make abundantly clear that a "<u>housing</u>" of an automatic injector is <u>not</u> the same as or interchangeable with a "<u>container</u>" for receiving therein an automatic injector.  They are different structures.
>
> Thus, any interpretation of the terms "housing" (of an automatic injector) and "container" (for receiving therein an automatic injector) as being interchangeable is completely baseless and improper in view of applicants' application.
>
> Furthermore, independent claims 19, 33, and 34 each require a container having an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> completely therein through the open end.
>
> Note that the claims require an automatic injector and <u>not</u> just internal parts or assemblies of an automatic injector.
>
> Note further that an automatic injector includes a housing - - even Wilmot '369 defines its auto-injector 10 as having a housing: "The auto-injector 10 is generally comprised of a forward housing member 12 and a rearward housing member 14 connected together to define a <u>housing</u> . . . ." Wilmot '369, column 7, lines 51-53; emphasis added.
>
> Nowhere does Wilmot '369 disclose that its housing members 12 and 14 have an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> (with its own housing) completely therein through the open end.

39

Housing members 12 and 14 are sized and configured to receive therein cartridge, needle, and drive assemblies -- not an automatic injector (*see* Wilmot '369, column 7, lines 59-66).

Wilmot '369 therefore does not anticipate independent claims 19, 33, and 34, which should be allowable.

For at least these reasons, dependent claims 20-24, 26, 28-32, 35, 41-43, and 48-50, which depend from independent claim 19, 33, or 34, are also not anticipated by or obvious from Wilmot '369, Wyrick, or the combination of Wilmot '369 and Bhitiyakul (*i.e.*, dependent claims are allowable if their independent claim is allowable).

Accordingly, applicants respectfully request that the rejections of claims 19-24, 26, 28-35, 41-43, and 48-50 under 35 U.S.C. §§ 102(b) and 103(a) be withdrawn.

91.     On June 26, 2008, the Examiner issued a Non-Final Rejection that included

rejections based upon the '369 patent.  The rejections stated as follows:

Claims 19-22, 24, 26, 28-29, 32-35, 41-43, 46-50 are rejected under 35 U.S.C. 102(b) as being anticipated by Wilmot et al. (U.S. 6,210,369).

Wilmot discloses a container comprising: interior walls forming a hollow interior sized and configured to receive an automatic injector (such as a rear housing 14 is covering an automatic injector, Figs. 1-11); an open end; a closed end opposite the open end; a cap 182 constructed and arranged to releasable engage the open end so as to releasable close the open end (Figs. 1 or 7-11); a needle retainer 56 mounted within the container proximate to the closed end (Figs. 2-5).  It is noted that the needle retainer 56 includes hub assembly 18, spring 94, adhesive 88, O-ring seal 82; the needle retainer formed of a resilient material; a shield 9, 92 mounted within the container; the shield further comprises an upwardly extending portion; the container 12 formed of a light permeable material (such as plastic member); closed end of the container is outwardly rounded; anti-roll protrusions (194) provided on an exterior surface (see Figs. 7-9).

The recitation that "for receiving therein an automatic injector" has not been given patentable weight because it has been held that a preamble is denied the effect of a limitation where the claim is drawn to a structure and the portion of the claim following the preamble is a self-contained description of the structure not depending for completeness upon the introductory clause.  Kroopa v. Robie, 88 U.S.PQ 478 (CCPA 1951).

Additionally, it is well established that a recitation with respect to the manner in which an apparatus is intended to be employed, i.e., ". . . to receive an automatic injector completely therein through the open end", a functional limitation, does not impose any structural limitation upon the claimed apparatus which differentiates it from a prior art reference disclosing the structural

40

limitations of the claim, see In re Pearson, 494 F.2d 1399, 181 U.S.PQ 641 (CCPA 1974).

Regarding claims 33, 41-43, 48-50, they encompass the same scope of the invention as to that of claims 19-22, 24, 26, 28-29, 32-35 except they are drafted in method format instead of apparatus format. The claim(s) is/are therefore rejected for the same reason as set forth above.

As noted that the recitation that an element is "sufficient" to perform a given function is not a positive limitation by only requires the ability to so perform. It does not constitute a limitation in any patentable sense.

. . . .

Claim 23 is rejected under 35 U.S.C. 103(a) as being unpatentable over Wilmot et al. (U.S. 6,210,369).

Wilmot discloses all claimed invention except for the shield is formed of a metal. However, Wyrick discloses that the shield (needle cover 90) provides rigid protection for needle 58. Therefore, one skill in the art would use metal material, since metal material having rigid characteristic for protecting the needle.

Claims 22-24, 29, 44-45 and 48 are rejected under 35 U.S.C. 103(a) as being unpatentable over Wyrick or Wilmot.

Regarding claims 22-24, Wyrick/Wilmot discloses all claimed invention except for the shield is formed of a metal; and the upward extending portion of shield substantially conical portion; the container is formed of a light permeable material.

As we know that the metal material having rigid characteristic. Therefore, one skill in the art would use metal material for protecting the needle. Also, it would have been an obvious matter of design choice to provide the upward extending portion of the shield substantially conical portion, and it appears that the invention would perform equally well with the any shape of the shield.

Beside that, it would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the container formed of light permeable material, since it has been held to be within the general skill of a worker in the art to select a known material on the basis of its suitability for the intended use as a matter of obvious design choice. *In re Leshin, 125 U.S.PQ 416.*

Regarding claims 29, Wyrick discloses all claimed invention except for that a flange provided proximate to the open end of the container at a location corresponding to the fully engaged position of the cap. It would have been obvious matter of design choice or common sense to provide a flange proximate to the open end of the container for fully mated with two separated parts.

Claims 30-31, 41 are rejected under 35 U.S.C. 103(a) as being unpatentable by Wyrick or Wilmot et al. (U.S. 6,210,369) in view of Bhitiyakul (U.S. 5,941,854).

Wyrick or Wilmot discloses all claimed invention except for a vent opening in the container nor needle retainer includes one or more vents.

41

Bhitiyakul discloses a vent opening 63 in the container to allow escape of air.

It would have been obvious at the time the invention was made to a person having ordinary skill in the art to modify the device of Wyrick or Wilmot with vent -openings, as taught by Bhitiyakul, in order for allowing for escape of as out from the container or the needle retainer.

92.    On September 26, 2008, Mr. Tuma filed a Reply to Office Action and included comments directed to the '369 patent.  Mr. Tuma's Reply substantively discussed the '369 patent. Mr. Tuma made the following statements with respect to the '369 patent:

Claims 19-22, 24, 26, 28, 29, 32-35, 41-43, and 46-50 were rejected under 35 U.S.C. § 102(b) as being anticipated by Wilmot '369.  Dependent claims 22-24, 29, 44, 45, and 48 were rejected under 35 U.S.C. § 103(a) as being obvious from Wilmot '369.  And dependent claims 30, 31, and 41 were rejected under 35 U.S.C. § 103(a) as being obvious from Wilmot '369 in view of Bhitiyakul.

These rejections are respectfully traversed.

Independent claims 19, 33, and 34 are directed to a <u>container</u> for an automatic injector.

Wilmot '369 is directed to an automatic injector and does <u>not</u> disclose a container for an automatic injector.

The Examiner stated that "Examiner interprets broadly the term "container or housing" is [sic] as something that holds something else such as a box, bottle, can, tube, a cover or protector.  Therefore, the housing (14 and 12) of Wilmot '369 is considered as a container." June 26, 2008 Office Action, page 11.

This interpretation is wrong.

"[P]ending claims must be 'given their broadest reasonable interpretation <u>consistent with the specification.</u>'" MPEP §2111; emphasis added.

Note the emphasized phrase: "consistent with the specification."

"This means that the words of the claim must be given their plain meaning <u>unless the plain meaning is inconsistent with the specification.</u>" MPEP §2111.01(I); emphasis added.

Note further that "the meaning of a particular claim term may be defined by implication, that is, according to <u>the usage of the term in the context in the specification.</u>" MPEP §2111.01(IV); emphasis added.

"Where an explicit definition is provided by the applicant for a term, that definition <u>will control interpretation of the term as it is used in the claim.</u>" MPEP §2111.01(IV); emphasis added.

Applicants' specification clearly defines and distinguishes the terms "housing" and "container."

"A typical automatic injector has a <u>housing</u> . . . ." Paragraph 4, line 1; emphasis added.

"Automatic injectors are typically packaged in <u>containers</u> to keep them

42

clean and protect them from damage." Paragraph 5, lines 1-2; emphasis added.

"One aspect of the invention relates to an automatic injector package. The . . . package comprises an automatic injector, a <u>container</u>, and indicia. The automatic injector includes a <u>housing</u>, a cartridge assembly carried within the <u>housing</u>, a needle assembly . . . , and an actuation assembly carried by the <u>housing</u>….The <u>container</u> is constructed and arranged to receive the automatic injector before and after use." Paragraph 6, lines 1-9; emphasis added.

"FIGURE 4 is a . . . view of the <u>container 10</u> showing an automatic injector 50 installed therein." Paragraph 44, lines 1-2; emphasis added. "The automatic injector 50 has an outer <u>housing 52</u> . . . . " Paragraph 45, line 6; emphasis added.

FIGURE 9A shows the <u>container 200</u> with an exemplary automatic injector 202 . . . ; FIGURE 9B shows the <u>container 200</u> . . . without the automatic injector 202." Paragraph 62; lines 3-5; emphasis added.

"<u>Containers</u> for automatic injectors and automatic injectors adapted for those containers are disclosed. The <u>containers</u> include structures adapted to retain and, optionally, cripple the needle of the automatic injector when the automatic injector is inserted into the container after use." Abstract, lines 1-4; emphasis added.

Moreover, as plainly recited in independent claim 1, the housing and container are <u>different</u> elements of the automatic injector package. In particular, the housing forms a <u>part</u> of the automatic injector: "an automatic injector including a housing," and the container is "constructed and arranged to <u>receive</u> the automatic injector before and after use" (emphasis added).

In sum, applicants' specification, drawings, and claims make abundantly clear that the <u>housing</u> of an automatic injector is <u>not</u> the same as a <u>container</u> for receiving an automatic injector.

"An applicant is entitled to be his or her own lexicographer and may rebut the presumption that claim terms are to be given their ordinary and customary meaning . . . ." MPEP §2111.01(IV).

Accordingly, the Examiner's interpretation of an automatic injector "housing" and a "container" for receiving an automatic injector therein being the same part or interchangeable parts is <u>inconsistent</u> with applicants' specification and is thus <u>improper</u>.

Furthermore, independent claims 19, 33, and 34 each require a container having the structural limitation of an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> completely therein through the open end.

An automatic injector inherently includes a housing -- even Wilmot '369 defines its auto-injector 10 as having a housing: "The auto-injector 10 is generally comprised of a forward housing member 12 and a rearward housing member 14 connected together to define a <u>housing</u> . . . ." Wilmot '369, column 7, lines 51-53; emphasis added.

Wilmot '369 discloses that its housing members 12 and 14 are sized and configured to receive therein various internal parts or assemblies of an automatic

injector -- that is, cartridge, needle, and drive assemblies (*see* Wilmot '369, column 7, lines 59-66) -- they are <u>not</u> sized and configured to receive a complete automatic injector.

Indeed, <u>nowhere</u> does Wilmot '369 disclose that its housing members 12 and 14 have an open end and a hollow interior sized and configured to receive an <u>automatic injector</u> (<u>with its own housing</u>) completely therein through the open end.

Wilmot '369 therefore does <u>not</u> anticipate independent claims 19, 33, and 34, which should be allowable.

For at least these reasons, dependent claims 20-24, 26, 28-32, 35, and 41-50, which depend directly or indirectly from one of independent claims 19, 33, or 34, are also not anticipated by or obvious from Wilmot '369 or the combination of Wilmot '369 and Bhitiyakul (i.e., dependent claims are allowable if their independent claim is allowable).

Accordingly, applicants respectfully request that the rejections of claims 19-24, 26, 28-35, and 41-50 under 35 U.S.C. §§ 102(b) and 103(a) be withdrawn.

93. During the prosecution of the '348 patent, the '369 patent was made known to Mr. Tuma  at least as early as receipt of the Office Action that was mailed from the U.S. Patent and Trademark Office on October 5, 2007.

94. Mr. Tuma did not disclose the '369 patent during the prosecution of the '012 patent, which was pending from April 1, 2005 until November 11, 2008.

95. Upon information and belief, Mr. Tuma knew of the materiality of the '369 patent to the patentability of the claims pending the '012 patent.

96. Mr. Tuma cited the '369 patent to the U.S. Patent and Trademark Office in an Information Disclosure Statement filed on January 8, 2009 in the application that matured into the '432 patent.

97. Mr. Tuma considered the '369 patent material to the patentability of the claims in the application that matured into the '432 patent.

98. Although Mr. Tuma disclosed the '369 patent in the application that matured into the '432 patent, he did not do so in the application that matured into the '012 patent.

99.     Upon information and belief, the '369 patent was also known to inventors John G. Wilmot; Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin James Mathews; and Joseph William Daintrey.  These individuals were named inventors on the '012 patent as well as on the '348 patent.

100.    Upon information and belief, each of these individuals was associated or substantively involved with the prosecution of the '348 patent and thus would have been familiar with the '369 patent from the numerous rejections based upon that reference made during prosecution.

101.    Upon information and belief, these individuals had knowledge of the materiality of the '369 patent to the patentability of the claims pending in the application that matured into the '012 patent.

102.    The '369 patent was not cited to the U.S. Patent and Trademark Office by any of these inventors during the prosecution of the '012 patent.

103.    Attorney Tuma and inventors John G. Wilmot; Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin James Mathews; and Joseph William Daintrey all failed to meet their duty to disclose material information to the U.S. Patent and Trademark Office during the prosecution of the '012 patent.

104.    From the time of the filing of the application that matured to the '012 patent through issuance by the U.S. Patent and Trademark Office of the '012 patent, each individual associated with the filing or prosecution of that application, including but not limited to Garry J. Tuma; John G. Wilmot; Sophie Rebecca Raven; Matthew Egerton Young; Stephen Philip Kirkwood; Colin James Mathews; Joseph William Daintrey; and Robert Hill had a duty of candor and good faith to disclose to the U.S. Patent and Trademark Office all information known

45

to that individual that is material to patentability, pursuant to U.S. patent laws and regulations, including 37 C.F.R. § 1.56(a).

105.    Failure to disclose the '369 patent to the U.S. Patent and Trademark Office was an omission by each of these individuals in contravention of their duties to the U.S. Patent and Trademark Office during the prosecution of the '012 patent.

106.    Upon information and belief, each of these individuals had knowledge of, and intentionally withheld, the '369 patent from the U.S. Patent and Trademark Office with intent to deceive the U.S. Patent and Trademark Office.

107.    These omissions were in contravention of these individuals' duties to the U.S. Patent and Trademark Office during the prosecution of the '012 patent.

108.    These omissions were material to patentability because, among other things, they were relevant to the questions of whether the claims of the '012 patent would have been novel or obvious to one of ordinary skill in the art and because there is a substantial likelihood that a reasonable examiner would have considered the '369 patent important in deciding whether to allow the '012 patent and because this reference either alone or in combination with other art such as PCT Publication WO 03/011378; U.S. Patent No. 6,641,561; or U.S. Patent No. 6,805,686, teach or imply elements of, or render obvious, various claims in the '012 patent.

109.    For each of the aforesaid reasons, the '012 patent is unenforceable due to inequitable conduct.

110.    Under the doctrine of infectious unenforceability, inequitable conduct during the prosecution of a parent application can infect a patent that issues from a continuation of that parent application.

111.    The '432 patent issued from a continuation of the '012 patent.

46

112.    Because the '432 patent is a continuation of the '012 patent and the '369 patent would have been material to the patentability of the claims pending in the application that matured into the '012 patent, Intelliject is entitled to a declaratory judgment that the '432 patent is unenforceable due to inequitable conduct that occurred during the prosecution of the '012 patent.

## COUNTERCLAIM 5

## IMPROPER LISTING OF THE '432 PATENT IN THE ORANGE BOOK

113.    Intelliject repeats, reiterates, and realleges in this COUNTERCLAIM each and every allegation stated in paragraphs 1-112 above as if fully set forth herein.

114.    Pursuant to 21 U.S.C. § 355(c)(3)(D)(ii)(I) (2010), Intelliject seeks an order requiring Meridian to delist the '432 patent from the Orange Book, on the ground that the '432 patent does not claim either the drug for which Meridian's NDA was approved or an approved method of using the drug.

115.    The drug for which Meridian's NDA was approved is epinephrine, 0.3 mg and 0.15 mg.

116.    Meridian's NDA was filed and approved under 21 U.S.C. § 355(b)(1).  Section 355(b)(1)(G) states, in part:  "The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."

117.    FDA regulations implementing § 355(b)(1) describe the kinds of patents that must be submitted for listing in the Orange Book.  For instance, 21 C.F.R. 314.53(b) (2010) states: "such patents consist of drug substance (active ingredient) patents, drug product (formulation and

composition) patents, and method-of-use patents."   Rule 314.53(b) also identifies the kinds of patents that must not be submitted for listing in the Orange Book:   "Process patents, patents claiming packaging, patents claiming metabolites, and patents claiming intermediates are not covered by this section, and information on these patents must not be submitted to FDA."  Id.

118.    According to the Orange Book, Meridian represented to the FDA that the '432 patent is a drug product patent.  (See Exhibit 10.)

119.    With respect to drug product patents, Rule 314.53(b) states:   "For patents that claim a drug product, the applicant shall submit information only on those patents that claim a drug product, as is defined in 314.3."  Id.

120.    According to 21 C.F.R. 314.3 (2010), "Drug product means a finished dosage form, for example, tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients."

121.    When submitting patent information for listing in the Orange Book upon or after approval of an NDA, the applicant must file Form FDA 3542, entitled "Patent Information Submitted Upon and After Approval of an NDA or Supplement."   In accordance with Rules 314.53(b) and 314.3, Form FDA 3542 includes a Section 3, entitled:   "Drug Product (Composition/Formulation)".  (Exhibit 11 at p. 2).

122.    The '432 patent is entitled "Automatic Injector with Kickback Attenuation."

123.    Each claim of the '432 patent, with the exception of claim 20, claims an "auto-injector" comprising various physical features.  Claim 20 of the '432 patent claims a "method of attenuating kickback in an auto-injector."

124.    The '432 patent does not claim either a composition or a formulation of epinephrine.

48

125.    The '432 patent does not disclose a composition or a formulation of epinephrine.

126.    The word "epinephrine" does not appear anywhere in the '432 patent.

127.    In view of the foregoing, the '432 patent does not claim either the drug for which Meridian's NDA was approved or an approved method of using the drug.  Therefore, pursuant to 21 U.S.C. § 355(c)(3)(D)(ii)(I) (2010), the '432 patent must be delisted from the Orange Book.

## PRAYER FOR RELIEF

Wherefore, Intelliject prays for judgment and relief against King and Meridian including at least the following:

(A)    A dismissal with prejudice of Plaintiffs' Complaint and a denial of Plaintiffs' claims for relief against Intelliject;

(B)    A declaration that Intelliject's proposed epinephrine device does not, has not, and will not infringe U.S. Patent No. 7,794,432 directly, indirectly, by inducement, literally or under the doctrine of equivalents, or in any other manner;

(C)    A declaration that U.S. Patent No. 7,794,432 is invalid;

(D)    A declaration that U.S. Patent No. 7,794,432 is unenforceable due to patent misuse by Plaintiffs;

(E)    A declaration that U.S. Patent No. 7,794,432 is unenforceable due to inequitable conduct;

(F)    An order requiring Meridian to remove U.S. Patent No. 7,794,432 from the Orange Book;

(G)    A declaration that Intelliject has a lawful right to obtain FDA approval of its NDA No. 201379 for its proposed epinephrine device;

49

(H)      A declaration that Intelliject has a lawful right to manufacture, use, offer to sell, sell, and/or import its proposed epinephrine device once its NDA is approved by the FDA;

(I)      An injunction permanently preventing Plaintiffs from asserting or enforcing U.S. Patent No. 7,794,432 against Intelliject, its divisions, subsidiaries, licensees, customers, or agents;

(J)      Judgment that this is an exceptional case and that Intelliject be awarded costs, expenses and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

(K)      Awarding such other and further relief as this Court may deem just and proper.

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

/s/ Margaret F. England
Margaret F. England, Esquire (Bar No.: 4248)
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801
Telephone:  (302) 425-0430
Fax:  (302) 425-0432

Of Counsel:
Bridget E. Montgomery, Esquire
Eckert Seamans Cherin & Mellott LLC
213 Market Street, 8th Floor
Harrisburg, PA  17101-2132
(717) 237-6054
(717) 237-6019 (fax)
*Attorneys for Defendant Intelliject, Inc.*

Dated:  February 11, 2011